## PRICE v. REYNOLDS METALS CO., Inc.

### Civil Action No. 7324.

District Court, E. D. New York.

Nov. 27, 1946.

Austin & DuPont, of Jamaica, N. Y. (Albert H. Buschmann, of Elmhurst, N. Y., and Stephen J. Masse, of Jamaica, N. Y., of counsel), for plaintiff (opposed).

Lundgren, Bartels & Lincoln, of New York City, for defendant (for the motion).

BYERS, District Judge.

This is a defendant's motion pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, for an order dismissing the first cause of action as pleaded, on the ground that it fails to state a claim upon which relief can be granted; and for summary judgment pursuant to Rule 56 as to the remaining causes of action.

The plaintiff sues for breach of a contract of employment, alleging that prior to April 5, 1946, the parties negotiated for a new employment contract of three years' duration from January 1, 1946, and that on April 5th the plaintiff duly executed a contract prepared by the defendant "and left it with the president of the defendant for execution by him and proceeded to go forward with his work pursuant to the terms of said contract, and was at all times ready, willing and able to continue the obligations under said contract on his part to be performed".

That according to its terms, the instrument sued upon provided that the plaintiff should be employed for a period of three

years at an annual salary of $20,000.00 plus 10% of the net profits of the employer not to exceed $10,000.00 per annum, and that he entered upon the said employment and so continued until April 25, 1946, when he was discharged without cause or right; and that his damages amount to $85,125.00, namely, the compensation which he would have earned for the balance of the year 1946 and for the years 1947 and 1948.

In addition to the complaint, the motion papers consist of an affidavit made by one Rice, Vice-President of the defendant company, and an answering affidavit of the plaintiff. To the former are annexed the employment contract between the parties dated January 1, 1944, which seems to have been indefinite as to its duration, subject to the right of either party to terminate at any time, and which contract was in effect during the year 1946, and seemingly never was terminated, unless the alleged contract sued upon superseded it.

There is also attached the proposed agreement in question which is the basis of this cause of action.

There are also attached prior contracts not involved in the present controversy.

The first office of that affidavit is to demonstrate that the contract under which the plaintiff sues was never executed by the defendant as employer.

The answering affidavit contains the history of the relations between the parties established apparently in 1939 when the plaintiff says he was reemployed by the defendant "as General Manager of the Embossed Products Division" of the defendant company, located at 539 West 25th Street, New York City, and that he continued in that capacity until the date of his discharge; that during the month of December, 1945, or thereabouts, he took up with officers of the defendant a suggestion concerning his future employment, apparently in connection with possible joint operation of an independent enterprise, and as the result of several discussions it was mutually decided in January of 1946 that a new contract should be negotiated between the parties, to be retroactive to January 1, 1946. Those discussions involved the basic wages and a bonus, and apparently under date of March 20, 1946, the defendant sent to the plaintiff a copy of an agreement as then proposed by the former, which constitutes Exhibit C attached to the moving affidavit.

On April 5, 1946, the plaintiff says he attended a conference in Richmond, where the defendant company has its headquarters, which was participated in by Louis Reynolds and R. S. Reynolds, Sr., officers of the defendant company, and at that conference he was handed a letter dated April 5, 1946, copy of which is attached to his affidavit, and the revised contract as then proposed. On this subject, he says:

"We discussed the revisions and in particular the clause in paragraph (5) thereof giving the defendant the right to terminate the contract if I should fail to manage the business in a manner satisfactory to the President. I stated that I felt it was not necessary in view of the fact that * * * such a clause was mere excess. Although Mr. R. S. Reynolds Sr. agreed to sign without this clause, in the end, I signed the revised contract as submitted (Exhibit C) with the following change.

"I had also requested that my basic salary be $20,000.00 a year with a bonus not to exceed $10,000.00. I stated that this in no way increased my agreed wage, which would remain $30,000.00. This was agreed upon, and the changes were inked in by Mr. Louis Reynolds (see Defendant's Exhibit C). Two copies of the contract were handed to me to sign, which I did immediately.

"The contracts were then handed to Mr. R. S. Reynolds, Sr., who was the President of the defendant corporation, for his signature. Just as he was about to sign, Louis Reynolds stated in effect:

" 'Dad, you can't sign that contract without Mr. Wishert's O. K. It's beyond your limit without Board approval.' "

The plaintiff's affidavit continues, that he expressed surprise at this development, and he states why.

Then he turned to Mr. R. S. Reynolds, Sr., and asked: "Is this a deal?"

"He took my hand and stated, definitely and without equivocation, 'Yes, Charlie, it's a deal.' "

He says that he returned to New York, entertaining no doubt that the contract would be signed, and the affidavit continues:

"The contract I signed on April 5, 1946 (Exhibit C) was subsequently returned unexecuted by the defendant without explanation. I assumed that what was intended was that I should execute the contract transmitted on March 20, 1946, with the special clause concerning discharge, which I did. (It is not clear as to whether there were two separate instruments signed by plaintiff, or only one.)

"I continued on in my employment, and on April 25th Mr. Walter Rice telephoned me, telling me that I had signed the wrong contract. I felt that if they desired the clause permitting discharge in the contract which I had signed initially, I would satisfy them and return the said contract (Exhibit C) for their execution. Therefore, I immediately mailed these copies (Exhibit C) to Louis Reynolds."

The foregoing may be regarded as plaintiff's testimony on the subject, and the question is whether it establishes the contract upon which his first cause of action is based.

It will be observed that there was an existing hiring under a contract which had not been terminated, and that the parties were engaged in negotiating a new agreement, as to which the terms were under discussion as late as April 5, 1946, when the plaintiff expressed himself as satisfied and affixed his signature, but execution by the defendant did not take place because apparently the President was advised that he did not have the requisite authority.

If he did in fact lack the capacity to execute the written contract, he also lacked the authority to bind the corporation by saying: "It's a deal."

That the plaintiff himself must have realized that something remained to be done, in a legal sense, appears from the above quotation from his affidavit, in reference to the return of the proposed contract unexecuted, for he says, to repeat: "I assumed that what was intended was that I should execute the contract transmitted on March 20, 1946, * * *", which seems to have been a paper other than Exhibit C, and that was the paper which he says he was told on April 25th was the wrong contract.

The letter of March 20th is Exhibit 1 attached to the plaintiff's affidavit, and is addressed to the plaintiff, and states that it accompanies the "proposed employment agreement which you discussed in Richmond last week with Mr. J. Louis Reynolds, Mr. R. S. Reynolds, Jr. and me". The note closes with this: "I hope that the agreement as now drafted meets with your approval. If it does, will you please execute both copies and return them to us for execution."

Exhibit 2 attached to the affidavit is a letter of April 5th, evidently the one handed to the plaintiff in Richmond. The first paragraph is:

"I am sending you herewith two revised copies of your proposed employment contract. On explicit instruction from Mr. J. Louis Reynolds, I have made the following changes:" (Three in number)
And the letter closes:

"If the contract, as revised, is satisfactory to you, please execute both copies and return them *so that they may be executed* on behalf of the Company." (Italics supplied)

The foregoing seems to be consistent only with an understanding on the part of the defendant that there might be yet further negotiations or changes, and that no agreement would be effected until the defendant had actually signed the papers.

The circumstances seem to fall within the following quotation from Williston (1936) § 28:

"The distinction between preliminary negotiations and completed contracts is often involved in cases where the parties contemplate the execution of a written agreement. * * * It is also everywhere agreed that if the parties contemplate a reduction to writing of their agreement before it can be considered complete, there is no contract until the writing is signed."

The subject is also developed in Restatement, Contracts, §§ 25 and 26.

It should not be forgotten that these parties were not strangers, and that what was

shown according to the above recital was something other than an offer made by the defendant which, upon acceptance by the plaintiff, would establish a contract; the parties were already governed by a subsisting contract which could be superseded by a new contract, but the new relationship would have to be complete in itself in order that the prior one might be brought to an end.

The plaintiff argues that the contract was complete because the execution by the defendant was a mere formality, and that the complete agreement between the parties is found in Exhibit C plus the letter of transmittal, and cites: Disken v. Herter, 73 App. Div. 453, 77 N.Y.S. 300; Newburgh Dress Co., Inc., v. Nadler & Nadler, Inc., 251 App.Div. 330, 296 N.Y.S. 158; Pratt v. Hudson River Railroad Co., 21 N.Y. 305.

Some of the language appearing in these opinions, if read alone, would perhaps give color to the plaintiff's argument, but an examination of the cases themselves reveals that in no instance was there a document tendered by one side to the other in the apparent belief that it contained all the essential features upon which there had been an agreement, the effect of which would be to terminate an existing contract, accompanied by a letter which served as the agency of transmittal, which in terms refers to the contract as an instrument which *was proposed* for execution by both parties.

Disken v. Herter, supra, involved the failure to embody in a written contract what was found to be the entire agreement between the parties, and which had been reached orally; in effect, the Court held that damages, for breach of what was the entire contract, should not be denied to plaintiff because of the mere failure to embody it in written form, there being no "positive agreement that it should not be binding until so reduced to writing and formally executed".

Newburgh Dress Co., Inc., v. Nadler & Nadler, Inc., supra, permitted recovery upon an oral contract "although the writing contemplated by the parties was never executed". [251 App.Div. 330, 296 N.Y.S. 159.]

Pratt v. Hudson River Railroad Co., supra, cited in both of the foregoing, is as much in defendant's favor as plaintiff's, for it plainly states that the plaintiffs in that cause failed to prove their cause as pleaded: "But, as both the advertisement on the part of the company, and the proposition made by the plaintiffs, expressly contemplated that the contract for the work should be reduced to writing and executed by the parties, until that was done, the contract to let the work cannot be said to have been consummated. In the aspect, therefore, in which the plaintiffs have presented their case, they clearly have no claim."

The Court goes on to explain that the defendant had breached an oral contract to make a written contract, and recovery on that theory would be permitted, the then (1860) recent Code (Sec. 173) permitting a conformation of the pleadings to the proof.

Thus recovery was permitted upon the theory that the parties' oral contract was complete in itself, which was sufficient to enable the plaintiffs to recover.

In this case, Price sues upon a written contract which he says was legally complete without the defendant's signature; that is, he does not sue upon an oral contract upon the theory that no written contract was necessary to embody the mutual engagements of the parties, but upon a written contract which was executed by one party, but not the other.

He seems to sense the distinction in that part of his brief in which it is urged that the letter of transmittal (Exhibit 2, attached to plaintiff's affidavit) was in effect an execution of the enclosed contract.

"The letter and the contract are so united * * * (as) to permit both * * * to be construed together and the signature to the letter treated as subscribed to both."

The letter does not admit of that construction.

As to this cause of action, it seems clear: (1) that no new written contract was ever executed between the plaintiff and the defendant; and (2) that plaintiff does not allege the breach of an oral contract to make a written contract; and (3) that on April 25th the employment which was terminated was the one which had been agreed upon under date of January 1, 1944.

The second point in controversy is the contention offered by the defendant that, since there was no written contract, the basis of the plaintiff's claim under his first cause of action is a proposed contract not in writing and therefore unenforceable under the Statute of Frauds. This argument requires preliminary consideration from the procedural standpoint; the plaintiff argues that the Statute of Frauds may not be considered in a motion under Rule 12 since it constitutes a special defense which must be pleaded.

It may be true, technically speaking, that a motion under Rule 12(b) is to be distinguished from one made under Rule 56, but the distinction does not seem to be important, since the defect appears in the complaint, paragraph Third, in view of the following decisions: Continental Collieries v. Shober, 3 Cir., 130 F.2d 631; Kahn v. Cecelia Co., D.C., 40 F.Supp. 878.

■ Accordingly the question of the applicability of the Statute of Frauds will be considered either because the Court is permitted so much latitude under Rule 12 (b), or because the motion is also presented under Rule 56 for summary judgment.

The question then is whether the plaintiff's cause as pleaded is deficient because it asserts a contract not signed by the party to be charged therewith.

The plaintiff seeks to avoid the statute, upon the theory that the contract as pleaded is performable within one year because it could have been terminated within that time since the defendant reserved the right in paragraph (5) to discontinue it entirely; that is to say, to bring to an end the "designated business" which was the subject-matter, in its sole discretion; and since that right could have been exercised within a year, the Statute of Frauds does not apply. Reliance is had upon: Blake v. Voigt et al., 134 N.Y. 69, 31 N.E. 256, 30 Am.St.Rep. 622, Kent v. Kent, 62 N.Y. 560, 20 Am.Rep. 502.

The defendant cites: Cohen v. Bartgis Bros. Co., 264 App.Div. 260, 35 N.Y.S.2d 206; affirmed 289 N.Y. 846, 47 N.E.2d 443; Elsfelder v. Cournand, 270 App.Div. 162, 59 N.Y.S.2d 34.

The cases are not in conflict on this point, as will be seen from this passage in the opinion in Cohen v. Bartgis [264 App. Div. 260, 35 N.Y.S.2d 208]: "But 'termination is not performance, but rather the destruction, of the contract * * * where there is no provision authorizing either or both of the parties to terminate as a matter of right.' Blake v. Voigt, 134 N.Y. 69, 31 N.E. 256, 30 Am.St.Rep. 622."

Thus the rule of the latter case was recognized in New York as lately as 1942, that where the contract itself provides for its possible cancellation within one year, the Statute of Frauds does not bar recovery.

In this case, the defendant reserved the right to cancel, by inserting into the proposed new contract a paragraph reserving the right to discontinue the Designated Business, which would automatically operate to evacuate the functions of its General Manager, and also the right to terminate the contract if plaintiff should fail to function in a manner "satisfactory to the President" of defendant. This provision was in substitution apparently for the right to terminate reserved to both parties in the earlier contract (Exhibit B, attached to Rice affidavit).

■ If the rule of decision in Blake v. Voigt, supra, is understood, the contract alleged in the first cause of action does not fail by operation of the Statute of Frauds.

This means that, if the Court is in error in holding that the plaintiff has failed to demonstrate that the proposed contract (Exhibit C, Rice affidavit) ever came into legal existence, it is not to be avoided because of the Statute of Frauds.

This is not a case in which plaintiff relies upon part performance, and the cases cited by defendant on that subject will not be discussed.

If the view is correct that no contract whatever was entered into between the parties in April of 1946, the question of the Statute of Frauds is of no consequence.

The remaining causes of action, Second to Eighth, inclusive, are of the same character, and depend upon allegations in the Sixth, Eighth, Tenth, Twelfth, Fourteenth, Sixteenth and Eighteenth paragraphs which

are substantially uniform and read as follows:

"That the defendant, separately and distinct from his regular employment, employed the plaintiff on a special consulting basis in the development of (a separate item as to each alleged cause), and that the fair and reasonable value of the services of the plaintiff for the work performed by him at the defendant's request respecting said (device) is the sum of Five Thousand ($5,000.00) Dollars."

The respective sums in the later paragraphs are $2,500.00, $2,500.00, $1,000.00, $5,000.00, $2,000.00 and $2,500.00.

These sums, added to that alleged in the first cause, bring the demand for judgment on the part of the plaintiff to the sum of $105,625.00.

It will be observed that no date is specified concerning the alleged separate and distinct hirings, nor is there any indication as to whether any was in writing; nor are other pertinent details given.

The contract (dated January 1, 1944) in effect on April 25, 1946, contained a provision whereby the plaintiff agreed in consideration of his employment:

"(1) To promptly and fully disclose to Employer or its nominees, and upon request, transfer to Employer, Employee's entire title and interest in (a) all inventions and improvements conceived or originated or developed by Employee during working hours, or on the premises of Employer, either solely or jointly with others, and (b) all inventions and improvements conceived or originated or developed by Employee before the final termination of Employee's employment, relating to the business of Employer or any of its subsidiary or affiliated companies."

The plaintiff's answering affidavit, in discussing these matters, says:

"In the three-year contract under discussion, the term 'designated business' is referred to, and the further explanation is that the designated business is the Embossed Products Division of Reynolds Metals.

"Because of my previous experience in the various fields referred to, namely; spark plugs, phonograph records, motion picture reels, picture frame mouldings, venetian blinds, aluminum toys and aluminum clock and radio cases, I was possessed of a special knowledge as to the opportunities for developing the use of aluminum in such fields. I offered my services in this special work in an effort to further develop the business of the Reynolds Metals Company, in addition to operating the Embossed Products Division.

"These seven topics for development work on my part were covered in a memorandum signed by Mr. R. S. Reynolds Sr. by which he definitely assigned these seven projects to me (see attached memorandum marked Exhibit 3).

"The Embossed Products Division was engaged in various enterprises concerning the use of foil, whereas aluminum products were produced in other divisions of the defendant corporation. Manifestly, therefore, a separate arrangement would be necessary to compensate me for these services performed in addition to my employment as general manager of the Embossed Products Division."

While the above quotation reveals the plaintiff's theory to be that the new proposed contract, which was never executed, was confined by its terms to the designated business; namely, Embossed Products Division, and that any work which he did in connection with company products not therein comprehended would necessarily be the subject of a separate arrangement for compensation, it is clear that the basis for this assertion must be sought in the earlier contract, which was in effect, because not previously terminated, on April 25, 1946. In other words, it is not open to the plaintiff to urge that services that he says he rendered prior to the time of his dismissal can be identified, or established within the provisions of the contract alleged in the first cause of action; recourse must be had to Exhibit B attached to the Rice affidavit, to ascertain whether according to *its* terms, the plaintiff's alleged causes of action Second to Eighth can be thought to be susceptible of proof.

The argument presented in the Rice affidavit on this subject is:

"Any work of the plaintiff, referred to in the Second to Eighth causes of action, in-

clusive, in the complaint related to the business of defendant, Reynolds Metals Company. Defendant is in the business of producing aluminum and manufacturing things for which aluminum is suited. Therefore any work which plaintiff did in the development of uses for aluminum related directly to defendant's business and by the specific language of said contracts of employment was included therein."

This directs attention to the specific language above quoted from clause (1), and the question is, whether the plaintiff must be dismissed without a trial upon the issue of whether he was specially employed on a consulting basis, namely, whether such employment could have existed from time to time, parallel but exterior to his contract with the defendant (Exhibit B, Rice affidavit).

He points to a general notice, constituting Exhibit 3 of his own affidavit, bearing the signature of defendant's President, dated May 24, 1944, probably intended for the information of all those engaged in the defendant's business, in which it is stated that the Management announces the recent completion of an extensive expansion program "in our 25th Street Plant, taking in several times the original space allotted to this activity."

"The Embossed Products Division is now in a position to undertake an extensive expansion program and handle the development, production and sale of a number of new items. * * *

"At the present time, the special items include the following, and it is desired that all matters relating to these items be referred to Charles S. Price, at our New York Plant for handling:"

Then follows a list of the seven items referred to in the Second to Eighth causes of action. The notice concludes as follows:

"The Management is confident that under the General Managership of Charles S. Price, this increased scope of the Embossed Products Division will be particularly productive. These items tie in effectively the South Kearny Research Plant with the Embossed Products Division and the Capsule Division, which will continue to operate as formerly, under the General Managership of Charles S. Price."

The foregoing is urged by the plaintiff to be consistent with his assertion that he rendered special services upon a consulting basis in order to bring about the developments so recited. Perhaps it is, but I cannot assign evidential value to it for present purposes.

He also points to Exhibit 4 attached to his affidavit, being a letter signed by Mr. R. S. Reynolds, Jr., written to him on April 9, 1946, reading:

"Dear Charlie:

"Mr. Reynolds has directed me to inform you that the Board of Directors have approved the payment of additional compensation to you for unusual services rendered to the Company during the year 1945.

"I am happy to enclose your check herewith.

"With kind personal regards,
    "Sincerely yours,
        "Richard
        "R. S. Reynolds, Jr."

The meaning of "unusual services" is argumentative and a jury might conclude that the foregoing letter should be construed as an admission by the defendant that special services, not contracted for in said Exhibit B, had indeed been rendered by the plaintiff prior to the time that the letter was written; a sufficient doubt is created in my mind on this subject to justify a decision that the plaintiff must have his day in court on this issue. It will be seen that the foregoing letter was written after the negotiation for the new contract as proposed had been carried forward, and the purpose of voting the extra compensation might well have been to compensate for that which the said contract did not cover.

It is further to be remembered that the proposed contract, which was not executed by defendant, contained a provision not found in that of January 1, 1944, namely:

"(2) * * * In consideration of the annual salary of $20,000.00 payable by Reynolds to Price referred to in paragraph No. (3) (a) hereof, Price shall also perform *such other duties and functions as may be*

*required from time to time by J. Louis Reynolds* or by any other officer or officers of Reynolds designated by the President of Reynolds." (Italics supplied)

It could be urged with reason that this language, taken in conjunction with the nearly contemporaneous letter and check above referred to, was compatible with a recognition by defendant that services had been rendered by plaintiff in excess of those contracted for under date of January 1, 1944, and that nothing should be left to argument concerning future similar services under the new proposed contract for a General Manager.

The clause quoted from Exhibit B concerning the disclosure and transfer of inventions and improvements, etc., does not destroy the possibility of plaintiff's recovery under these counts: The consultation services that he alleges, if established, would probably precede invention and improvement; upon the outcome of such consultation might well depend the decision to seek to solve a known problem through invention or improvement; if the latter should evolve, *then* the obligation to disclose and transfer would arise.

Consultation might cover a wide range of subjects, and result in the acceptance of certain ideas for projection into concrete form, and the rejection of others. The plaintiff's duties under Exhibit B are not specified; he is merely designated as "Employee", and while such consultation as he relies upon may have fallen within his contractual duties, he should not be foreclosed of an opportunity to offer competent evidence to the contrary if he can.

The vacillation demonstrated by the defendant in its dealings with the plaintiff during the month of April, 1946, rather points to an infirmity of purpose at headquarters touching its relationship with the plaintiff; the condition is so apparent to this Court, that in fairness to him, it is necessary to deny so much of defendant's motion for summary judgment as is directed to causes Second to Eighth, inclusive; as to the first cause, the motion is granted, under Rule 12(b) (6), for failure to state a claim upon which relief can be granted, with leave to amend, if the plaintiff be so advised, within 10 days after service of the order to be entered herein.

Settle order.